WILLIAM S. SPITZ AND BARBARA A. SPITZ, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Spitz v. Commissioner
Docket No. 24515-87
United States Tax Court
T.C. Memo 1990-519; 1990 Tax Ct. Memo LEXIS 572; 60 T.C.M. (CCH) 920; T.C.M. (RIA) 90519; September 27, 1990, Filed *572 Decision will be entered under Rule 155. James W. Gardner, for the petitioners. Edward G. Langer and James M. Klein, for the respondent. COLVIN, Judge. COLVIN
MEMORANDUM FINDINGS OF FACT AND OPINION The primary issue for decision is whether respondent has shown by clear and convincing evidence that petitioners should be subject to the addition to tax for fraud based on petitioners' treatment *573 of two items: (1) four $ 5,000 payments from the Katz Company in 1977 and 1978, and (2) tax shelter fees in the amount of $ 10,340, $ 11,200, and $ 3,450 received in 1977, 1978, and 1979, respectively. [1] As discussed below, we hold that the payments from the Katz Company were gifts, but that petitioners were fraudulent in their reporting of tax shelter fees in 1977 and 1978. Respondent determined deficiencies and additions to tax as follows: Addition to Tax
Year
Deficiency
Sec. 6653(b) [2]
1977
$ 6,119
$ 3,060
1978
9,687
4,844
1979
2,951
1,476
*574 Respondent concedes that petitioners did not understate their income from tax shelters for 1979 and that they are not liable for the addition to tax under section 6653(b) for 1979. Respondent further concedes that if we decide that petitioners are not liable for the addition to tax under section 6653(b) for 1977 and 1978, the deficiency determinations for those years are barred by the statute of limitations pursuant to section 6501(a). FINDINGS OF FACT Some of the facts have been stipulated and are so found. 1. Background
Petitioners resided in Madison, Wisconsin at the time they filed their petition in this case. Petitioners filed joint income tax returns for each of the years 1977, 1978, and 1979. Petitioner William Spitz is a certified public accountant with the firm of William S. Spitz & Associates in Madison, Wisconsin. (Hereafter, all references to petitioner are to William Spitz.) During the years at issue, petitioner was a partner in the certified public accounting firm of Baillies, Denson, Erickson and Smith (Baillies, Denson) of Madison, Wisconsin, engaging in financial consulting and tax return preparation, among other things. Previously, he was *575 employed by the Internal Revenue Service in Chicago, Illinois, as a revenue agent from 1961 to 1964. During the years at issue, Barbara Spitz was employed as a teacher for the Madison, Wisconsin School District. She has a bachelor's and master's degree in education. The years 1977 through 1979 were busy and hectic for the Spitzes. Their children were growing and were at an age where they had many events and activities. In addition, petitioner's accounting practice had grown to the point where it required large amounts of time. Finally, petitioner was involved in managing the money and keeping the books and records for various investments, including E.L. Associates, E.L. Associates II, S.G.M. Associates, and Five Star Enterprises. Petitioner was also the personal representative for the estate of Rose Schain, and managed the estate's funds. During 1977 through 1979, petitioners received money from a variety of sources, including: their respective employment; investments; inheritance from the Rose Schain estate; fee income from I. Sidney Feit; certain amounts from the Katz brothers; and the proceeds of a loan. Petitioner did not keep the personal records he used in the preparation *576 of his tax return in the manner of a formal business; instead he relied upon his checkbook records, plus income statements such as Forms 1099 that he received from various payors. Petitioners kept these statements and other tax documents in a box that was kept in a desk drawer. Either petitioner would deposit documents having possible tax ramifications into the box. A new box was started for each year. Based on his knowledge and experience, petitioner would prepare a joint tax return for himself and his wife in one evening. He would do so by examining the contents of their tax documents box described above and reviewing his checking account records. Barbara Spitz was not involved in the preparation of the tax return. 2. Payments from the Katz Company
The Katz Company, Inc., is a corporation located in Plover, Wisconsin engaged in the business of agri marketing. It was started in approximately 1969 by Eugene and Bennett Katz, its two principal shareholders (Eugene is the president; Bennett is the secretary-treasurer) (hereafter, Gene and Ben). The Katz Company has been very successful financially. Since the founding of the Katz Company, Gene and Ben Katz have *577 established a history of generosity and giving to both institutions and individuals. They contributed to the Stevens Point Foundation, were on the YMCA Board, and each contributed $ 25,000 for a new temple. The Katz Company was an accounting client of Baillies, Denson during the years 1977 through 1979 and prior thereto. Petitioner was the partner in charge of this account. At no time did Barbara Spitz perform any accounting services for the Katz Company or Gene or Ben Katz. Petitioner or another Baillies, Denson employee did all of the accounting for the Katz Company during the years in question. All of the accounting work done for the Katz Company was billed by Baillies, Denson and paid for by the Katz Company. The Katz Company was on a fiscal year ending June 30 with respect to the filing of its corporate income tax returns (Form 1120) for 1977 through 1979. Petitioners have known Gene and Ben Katz and their families since 1964, when they were all living in Wausau, Wisconsin, and have become close personal friends. For example, Gene and Ben Katz were the only nonfamily members at petitioners' son's confirmation and bar mitzvah and petitioners' daughter's bat mitzvah. *578 They also attended petitioners' daughter's wedding. Ben Katz, who is not married, often traveled from his home in Stevens Point to Madison to watch petitioners' son play basketball for his high school team. Gene Katz' wife often stayed at petitioners' home when she went to Madison for medical care. Over the years, petitioner became the accountant for the Katzes and their various business entities. He was instrumental in assisting them in organizing the Katz Company, and has counseled both Ben and Gene individually with respect to their personal finances. Petitioners received two checks of $ 5,000 each from the Katz Company in both 1977 and 1978. These amounts were not reported on petitioners' income tax returns as originally filed. The payments were made on June 22, 1977, December 16, 1977, July 6, 1978, and December 21, 1978. Accompanying each of the checks were notes from Ben Katz, which expressed his and Gene's appreciation and friendship. On each occasion on which they received money from the Katzes, Barbara Spitz wrote thank you notes expressing their gratitude to the Katzes. In 1979 the Katz brothers ceased making payments to petitioners because petitioner did *579 not want the relationship between himself, his wife, and the Katzes to be affected by them. The Katz Company uses a voucher type of check for payment of its expenses. The voucher type check provides duplicate copies of the check and check stub attached thereto. It was standard Katz Company procedure to indicate on the check stubs the reason for the payment. No reason was contained on the stubs attached to the checks sent to petitioners. The only notation contained on any of these stubs was "account #16," indicating to the Katz Company bookkeeper that the amounts were charged either to account number 16, or accounts payable. Account number 16 is the account where expenditures for professional services rendered to the Katz Company are posted. Neither the Katz Company nor the Katz brothers individually filed Federal or State gift tax returns with respect to any payments made to petitioners during the years at issue. Petitioners similarly failed to file any Wisconsin gift tax returns with respect to these payments. At the time the payments were made to petitioners from the Katz Company, State and Federal gift tax returns were required to be filed if the gift from a single donor *580 to a single donee was in an amount in excess of $ 3,000 per year. With respect to the payments made to petitioners during the years at issue, Ben was responsible for determining how those items were reflected on the corporate books. These payments were mistakenly entered on the corporate books in the professional services account. Thus, the Katz Company deducted the payments it made to petitioners during 1977 and 1978 as a corporate business expense on its accounting books and on its corporate tax returns (Form 1120) for both of those years. These entries were made by either Janice Ernst, a bookkeeper with the Katz Company, or Ben Katz, without any instruction from petitioner. At the time the payments to petitioners were made, Ben told the bookkeeper to treat the payments to petitioners as she usually did. The Katz Company failed to correct its corporate tax records regarding retained earnings for the payments it made to petitioners. The Katz Company did not report a dividend to its shareholders, the Katz brothers, with respect to the payments it made to petitioners. As treasurer of the Katz Company, Ben Katz was in charge of its bookkeeping and accounting procedures during *581 the years at issue. Ben reviewed the corporate books and records, including its ledgers and journals. For example, he was responsible for determining the treatment of the company's expense items for bookkeeping and accounting purposes. Petitioner was not involved in deciding how to record the payments on the corporate books, and, in fact, did not learn of the mistake until February 11, 1980, during a meeting with the Katz brothers and Revenue Agent Thomas Spaay. The mistake was discovered during Agent Spaay's audit of the Katz Company. In the course of their meeting with Agent Spaay, both the Katz brothers and petitioner explained that the payments were gifts from the Katz brothers to petitioners and had been mistakenly entered on the Katz Company books. Petitioner's accounting firm prepared the Katz Company tax returns for fiscal years 1977, 1978, and 1979. He was personally involved in the preparation of those returns. The 1977 and 1978 returns contain no adjustments as a result of the gift payments from Gene and Ben Katz to petitioners. In 1982, the Katzes, through the Katz Company, lent $ 200,000 to Baillies, Denson. This sum was borrowed by the Katz Company from its *582 bank and lent, without profit, to the firm solely because of the close personal relationship between Gene and Ben Katz and petitioner. In the course of the accounting services he performed for the Katz Company, petitioner did not use the books of original entry which reflected the bookkeeping entries in question. He was not familiar with and did not know the internal account numbers of the various Katz Company accounts maintained in its original books and records. 3. Tax Shelter Fee Income
During the years 1977 through 1979, petitioners received fee income from master recording and computer software tax shelter investment developer, I. Sidney Feit (Feit), a/k/a ISF Ventures, Inc., as a result of petitioner's involvement in the provision of tax shelter investments to several of his clients. The fee income was paid by multiple checks to either William Spitz or Barbara Spitz. Petitioners misreported the gross receipts therefrom on their income tax returns for these years in the following manner: Year
Reported
Actually Received
1977
$ 5,022
$ 10,340
1978
5,200
11,200
1979
6,520
3,450
Feit did not issue a Form 1099 or any *583 other report which notified petitioners of the total income that they received from him during 1977. A Form 1099 in the amount of $ 8,000 was timely issued and received by petitioners which correctly reported the payments made to Barbara Spitz for 1978; however, no Form 1099 was sent reporting the 1978 payments to William Spitz. In 1979, a Form 1099 was sent which correctly reported the 1979 payments to William as $ 3,450. Barbara Spitz did not receive any fee income from Feit for the year 1979. At the time he prepared their income tax returns for the years at issue, petitioner knew that all fee income must be reported. Some of the unreported tax shelter income earned by petitioners for the years at issue was paid to the bank account of Barbara Spitz. Thus, payments in the amount of $ 5,820 and $ 9,020 for the years 1977 and 1978, respectively, were deposited in her savings account at the Bank of Middleton. Alan Weiner, a New York stock broker, worked with Feit in marketing the tax shelter investments. He also handled some of petitioner's personal investments and upon occasion apprised petitioner of certain investments which he believed might be of interest to petitioner's *584 clients. In 1977 and 1978, he asked petitioner to analyze the viability of some proposed investments that had been developed by Feit. Wiener indicated that he would share a portion of his fee with Spitz should any of the investments be placed with Spitz' clients. During their discussions, petitioner told Weiner that some of the checks should be made payable directly to Barbara Spitz so that she could deposit them into a savings account she maintained, and into which most of the family's long-term savings were deposited. A large portion of the funds received by petitioners from Feit in 1977, 1978, and 1979 was in fact deposited into this savings account. During 1977 through 1979, several of these investments were placed with clients of petitioner. As a result, he received payments from Feit, who had been directed to make the payments by Weiner. In 1977, the payments came by means of Feit's personal check. In 1978 and 1979, the payments came by means of checks drawn on ISF Ventures, Inc. For State income tax purposes, petitioners claimed that the consulting income was that of Mr. Spitz. Petitioners also claimed that all amounts received, with respect to the tax shelters, *585 were consulting income and not commission income. The checks received by petitioners with respect to the sale of tax shelters were similar in nature. The front and back of some of the checks contained the notation "commissions." The name of the tax shelter investor was listed on some checks. Petitioners did not maintain records with respect to the tax shelter income received in 1977, 1978, and 1979. However, petitioner maintained detailed records regarding receipts and disbursements for various business entities in which he was involved during the years at issue. Petitioners' Social Security numbers on the Forms 1099 received for 1978 and 1979 were incorrect. The Form 1099 received by petitioner for 1979 with respect to the income from Feit contained all of the correct numbers in his Social Security number, but had three transpositional errors therein. Similarly, the Form 1099 received by Barbara Spitz for 1978 regarding the Feit income contained an incorrect Social Security number. This mistake was not discovered until 1989 during preparation for the trial in this case. Petitioner did not remit amounts received from Feit to his accounting firm because he considered those *586 amounts as payment for services provided outside the scope of his ordinary duties. Baillies, Denson did not charge for work done by brokers or investment people. When preparing their Federal income tax returns for the years at issue, petitioners did not review their bank accounts to determine whether any deposits of taxable income were made and not reflected on the schedules given them by the payors thereof. Petitioner estimated the amount of tax shelter income he reported on Schedule C of the 1977 income tax return but did not contact Feit to verify the amount. Petitioner was unable to recall how he determined that $ 5,022 was the proper amount to be placed on Schedule C for 1977. Petitioner also estimated the amount received from Feit that was reported on Schedule C for 1978 because Barbara Spitz inadvertently placed the Form 1099 she received in the tax records box petitioners were starting to maintain for 1979. Therefore, when petitioner was preparing the 1978 return, he did not find the Form 1099 that had been received. As a result, he reported income from Feit in the estimated amount of $ 5,200. When petitioner was preparing the Federal return for 1979, he found not *587 only the Form 1099 from Feit for that year, but also the Form 1099 from him for 1978. He realized that he had underreported Feit income for 1978. Rather than filing an amended return for 1978, he added the difference between the $ 5,200 he had actually reported and the $ 8,000 which the Form 1099 showed ($ 2,800) to the amount he had actually received for 1979 ($ 3,450). In making this calculation, he inverted a five and two and reported income of $ 6,520 instead of $ 6,250 from Feit. Petitioner testified that he was not interested in the deduction part of the business relating to tax shelters. Petitioner did not know how Wiener computed the fee paid to him. Petitioner and Wiener never discussed the preparation of Form 1099 with respect to the tax shelter income paid to petitioners. 4. Petitioners' Amended Returns
On July 15, 1980, the IRS initiated the examination of petitioners' 1978 income tax return by sending them an appointment letter. After the IRS began its investigation of petitioners' 1978 return, petitioners filed an Amended Federal Individual Income Tax Return (Form 1040X) for 1978, which included income in the amount of $ 10,000 received from the *588 Katz Company. Petitioners indicated on the amended return that they originally considered the $ 10,000 they received from the Katz Company in 1978 to be a gift, but in 1980 believed the payments were income. This return was signed and dated by petitioners on July 11, 1980. It was not, however, mailed until after petitioners received a notice from the IRS that their 1978 tax return was being audited. The sole reason petitioner filed the amended return was to protect the Katzes from tax liability. The IRS received petitioners' initial amended return for 1978 on July 23, 1980. The postage meter stamp thereon was July 11, 1980. Thereafter, petitioners filed another amended Federal Individual Income Tax Return (Form 1040X), received by the IRS on June 11, 1984, excluding the money received from the Katz Company. Petitioner first met with Revenue Agent Marv Svacina and group manager Bob Davis on August 7, 1980, regarding the audit. On November 6, 1980, petitioners met with their attorney Gaar Steiner, and Revenue Agents Svacina and Ray Shields regarding their criminal investigation. During the course of the August 7 and November 6, 1980, meetings he had with revenue agents, *589 petitioner repeated the fact that he believed the payments were gifts when they were originally received by him and his wife. Petitioner told Agent Svacina that his report of income from Feit in both 1977 and 1978 was based upon his memory. He also stated that in 1979, when he discovered that he had underreported 1978 income from Feit, he made up the underpayment by reporting in 1979 the difference between what he reported and what he received in 1978. Petitioner's belief that he had correctly made up the difference between his underreporting in 1978 and what he actually received was based on the Form 1099 received by Barbara Spitz for 1978. Petitioner did not account for the additional payment he received in 1978 from Feit, and for which no 1099 was issued. Petitioner did not tell Agents Svacina or Shields that part of the $ 6,520 income from Feit reported on the 1979 return was income he had received during 1978. On January 20, 1981, Revenue Agents Svacina and Shields met with the Katz brothers and Gaar Steiner. The Katzes described the payments as gifts from themselves to petitioners, and repeated the fact that the entry on the corporate books was the result of a mistake. *590 During the course of this meeting, the Katz brothers spent a significant portion of time explaining why petitioner would not have discovered the improper entries during the ordinary course of performing his accounting services for the Katz Company. The Katz brothers then offered to pay any tax which was due as a result of the improper entry of the Spitz payments on the corporate books. However, this offer was refused by Agents Shields and Svacina, and no payment was ever tendered. OPINION We first consider whether petitioners are liable for additions to tax for fraud under section 6653(b) for 1977 and 1978. We do this because respondent's notice of deficiency was mailed to petitioners more than three years after the income tax returns for 1977 and 1978 were filed. Accordingly, assessment and collection of the deficiency for 1977 and 1978 are barred by the statute of limitations unless petitioners filed false or fraudulent returns for each year. Sec. 6501(c)(1). Respondent maintains that petitioners filed fraudulent returns for 1977 and 1978, and therefore assessment and collection of the deficiencies for those years are not barred by the statute of limitations. The existence *591 of fraud is a question of fact to be determined from the entire record. ; . Respondent has the burden of proving fraud by clear and convincing evidence. Sec. 7454(a); Rule 142(b); . Respondent must establish (1) that petitioners underpaid their taxes for each year, and (2) that some part of each underpayment was due to fraud. ; sec. 6653(c). Fraud is not presumed. Rather, it must be established by affirmative evidence. . Fraud may be inferred from conduct, the effect of which is to mislead or conceal, , or otherwise to prevent the collection of taxes, ; , affg. , or where an entire course of conduct establishes the necessary intent. *592 , affg. a Memorandum Opinion of this Court; ; . Fraud may also be proven by circumstantial evidence because direct evidence of the taxpayer's intent is rarely available. ; , affd. . For purposes of section 6653(b), fraud means actual, intentional wrongdoing, , [3] or the intentional commission of an act or acts for the specific purpose of evading a tax believed to be owing. ; , affd. , cert. denied . *593 Respondent bases the addition to tax for fraud on the taxpayers' treatment of two items: (1) four $ 5,000 payments from the Katz Company in 1977 and 1978, and (2) tax shelter fees in the amounts of $ 9,320 and $ 12,220 received in 1977 and 1978, respectively. We first consider the four $ 5,000 payments. 1. Payments from the Katz Company
Petitioners contend that the four $ 5,000 payments received in 1978 and 1979 are gifts, and not subject to income tax. Respondent contends that the payments are professional fees and taxable to petitioners. We agree with petitioners. In determining whether a transfer of property is a gift, consideration must be given to the transferor's objective intent at the time the transfer occurred. . A gift proceeds from a detached and disinterested generosity, out of affection, respect, admiration, charity, or like impulse. Conversely, if a payment is for services rendered, or paid under a moral or legal duty to pay, the transfer is not a gift, but may be compensation. . Here, the payments were from the Katz Company, *594 owned by Gene and Ben Katz. The Katzes and petitioners have a long, close, personal, and professional relationship. Petitioner has performed tax, accounting, and professional services for the Katzes and the Katz Company for about 25 years, since the mid-1960's. Petitioner has handled the Katzes' personal tax returns continuously since then, and the Katz Company tax returns since it was formed in 1969. Testimony by Ben and Gene Katz shows that petitioner also gave a wide range of additional financial and business planning advice over those years. Petitioner maintains that all those services were paid for in regular billings from Baillies, Denson over those years. The Katzes arranged a $ 200,000 loan for Baillies, Denson, petitioner's accounting firm, in 1982. This was done by the Katzes' borrowing that amount from the Stevens Point, Wisconsin, National Bank at a 16-percent interest rate, and relending it to petitioner's accounting firm on identical terms. This gave no financial benefit to the Katzes. Petitioner cites this as another example of the Katzes' disinterested generosity to petitioner. Petitioners and the Katzes were close family friends. They attended each other's *595 family functions. Petitioner is one of the executors of Gene Katz' will. The Katzes have made various charitable contributions over the years, and have a history of generosity and giving to their friends and employees. Gene and Ben Katz both testified that they intended the four $ 5,000 payments to be gifts to both petitioners. The record includes several thank-you notes written by Barbara Spitz at the time the payments were made which referred to them as gifts to both of the petitioners. There are possible inconsistencies with gift characterization. One is that the payments came from the Katz Company, and not from the Katzes as individuals. Both Gene and Ben Katz testified that since they owned the company they believed it did not make any difference who made the payments. Another inconsistency is that the Katz Company deducted the payments to petitioners as business expenses on their corporate returns for 1977 and 1978. The parties agree that if the payments were gifts, the corporation would have no deduction. This treatment presents two problems. First, it calls the Katzes' donative intent into question. Second, if petitioners were aware of the deductions by the *596 Katz Company when they treated the payments as gifts, it undermines the view that they were gifts. The Katz Company was audited for 1978 in 1980. One point raised by the IRS was the company's deduction of the four $ 5,000 payments to petitioners. The Katzes emphasized that at all times they intended these payments to be gifts to petitioners. Although Gene and Ben Katz offered to drop the deduction and pay any taxes and additions owing due to their improper treatment of the payments, the IRS closed the audit without pursuing it. The record does not show that petitioners knew of the deductions by the Katz Company until at least after 1979. Although petitioner prepared the company tax returns, his preparation did not require him to see the Katz Company books on which the four $ 5,000 payments were recorded, and we find that he did not see them. Petitioners amended their 1978 return in July 1980. The purpose of the amendment was to report the four $ 5,000 payments as income. Both Spitzes testified that this was prompted by the Katz Company's controversy with the IRS about the company's deduction of the four $ 5,000 payments. Agent Svacina testified that he thought the amendment *597 was done to take advantage of the voluntary disclosure policy, which he understood to mean that there would be no criminal prosecution of a taxpayer who had previously voluntarily disclosed his disputed position with respect to his return. Respondent's suspicions were heightened because Mr. Spitz had the envelope posted in a client's postage meter on July 11, 1980, but did not mail it until later. The Spitzes testified that they discussed whether to amend their return, and agonized over the matter. The fact that the amendment was made may have been in petitioners' interest in light of the voluntary disclosure policy; but it could also be viewed as a response to the embarrassment caused to the Katzes by the IRS audit of their company. Altogether, we believe the testimony of the Katz brothers to be credible that a gift was intended. The testimony of the Katzes and both of the Spitzes about their long, close friendship was believable, entirely consistent, and credible. We find that the four $ 5,000 transfers were gifts and not taxable to petitioners. 2. Tax Shelter Fees
The second basis for respondent's determination of fraud is petitioners' treatment of fees received *598 from a tax shelter promoter in the amounts of $ 10,340 and $ 11,200 in 1977 and 1978, respectively. Some of the tax shelter fees from Feit were made payable to Barbara Spitz even though she performed no services for Feit and had no accounting or tax background. She had met Feit only socially, and was employed as a teacher with the Madison school system. Petitioners explained that the tax shelter fees were made payable to Barbara Spitz because she was the better saver in the family. We find that to be a strained and self-serving explanation. We also note that the Social Security numbers on the Forms 1099 sent to Barbara Spitz and petitioner were incorrect. The record does not show how the errors occurred. The Form 1099 for 1978 was received by petitioners early in 1979. They testified that Barbara Spitz erroneously put it in the box containing tax records for 1979, not 1978. Thus, when petitioner prepared the family tax returns for 1978, he did not see it. In addition, no Form 1099 was issued to petitioner for the tax shelter fee income he received in 1978. Viewed in conjunction with the unusual designation of the payments to Barbara Spitz, we believe petitioners were seeking *599 to avoid reporting this income on their tax returns. Petitioners correctly point out that the amounts were reported on their 1979 return. In light of the surrounding circumstances, however, we hold that petitioners' treatment of the tax shelter fees received in 1977 and 1978 was fraudulent. In view of our conclusion with respect to fraud, the assessment of the deficiencies due from petitioners is not barred by the statute of limitations. Sec. 6501(c)(1); ; . Because of our holding with respect to the gift payments from the Katz Company to petitioners, Decision will be entered under Rule 155. Footnotes
1. The parties stipulated that petitioners received tax shelter fees in the amounts set forth above. Respondent had originally asserted different amounts in his answer.↩
2. All section references are to the Internal Revenue Code of 1954, as amended and in effect for the years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
3. .↩